UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF LOUISIANA

DAVID HOSEY, ET AL.                          CIVIL ACTION

v.                                           NO. 19-9816

SHELL OIL COMPANY, ET AL.                    SECTION "F"

ORDER AND REASONS

Before the Court is a motion for summary judgment by Shell Oil Company and Shell Offshore Inc.  For the reasons that follow, the motion is GRANTED, and the plaintiffs' claims are dismissed.

**Background**

This personal injury case arises from a roustabout's claim that he hurt his lower back when he and a co-worker manually lifted and moved a washing machine into a cargo box while working the night shift on the Olympus Tension Leg Platform in the Gulf of Mexico.

Shell Offshore Inc.[1] owns and operates the Olympus Tension Leg Platform, which is located on and permanently attached to the Outer Continental Shelf at Mississippi Canyon Block 807, approximately 130 miles south of New Orleans.  The Olympus TLP has 24 well slots and a self-containing drilling rig.

---

[1] Shell Oil Company is an indirect owner of Shell Offshore Inc.; Shell Oil Company neither owns nor operates the Olympus TLP.

The facts are not in dispute.  Shell Offshore contracted with Helmerich & Payne International Drilling Company in which H&P agreed to provide personnel to perform drilling, completion, and other operations in support of the oil and gas development from the Olympus TLP.  Specifically, the parties' contract obliged H&P to "furnish PERSONNEL as expressly specified herein, physically fit, suitably trained, licensed and certified, as applicable and supervision."  Shell was designated as the "COMPANY" and H&P was designated as an "Independent Contractor" in which "the actual performance of the WORK shall be by CONTRACTOR" and "CONTRACTOR shall take reasonably necessary measures to provide safe working conditions in connection with the WORK."

On December 8, 2018, H&P lead roustabout David Hosey was working the night shift[2] on the platform's third floor warehouse porch.  The tasks to be performed by H&P that night included moving a washing machine into a shipping container; a task discussed and performed solely by H&P employees.  During a pre-shift meeting among only H&P employees, the employees discussed the work to be performed.  The washing machine was either on a list of equipment to be moved that evening, or the direction to move it was given later by the H&P deck supervisor, Mark Alston, who testified that

---

[2] The night shift started on 6 o'clock p.m. and ended at 6 o'clock a.m. on December 9.

one Mr. Gomillion was told by Shell that moving the washing machine was a task that needed to be completed during the particular shift.

The washing machine was located out on the platform's third floor warehouse porch, which is a landing area for a crane to place cargo boxes outside of the third-floor warehouse.  Once the cargo box was placed on the landing area by the H&P crane operator, H&P deck supervisor Mark Alston testified that he said "[w]hen we get a chance, we need to put [the washing machine] in that cargo box. It wasn't a priority."[3]  Hosey and his co-worker, Colby Davis, ultimately took on the task of moving the "regular white washing machine"[4] into the cargo box.  The washing machine, which weighed more than 50 pounds, was located about 10 feet away from the cargo box.[5]

H&P workers adhered to an H&P policy regarding lifting or moving heavy items.  H&P workers were instructed that "one person should not lift over 50-pounds" and "[i]f [an item] is known to be over 50-pounds or awkward, too awkward for one person to lift under 50-pounds, you should ask for assistance or use a lifting device." Consistent with H&P policy, Hosey and Davis briefly discussed how they would manually lift and then put the washing machine in the

---

[3] It was Alston's expectation that the roustabouts would figure out later who would be lifting the washing machine.
[4] It was actually a stackable washing machine-dryer combination unit.
[5] The cargo box, or open-topped pallet box, is a metal box about 4x4x4 with no top and one door that swings open.

box: with one man on either side of the washing machine, they "leaned the washer back, bent down, grabbed it and put it in the box." The cargo box with the washing machine in it was then lifted by crane to another deck.

H&P deck supervisor Alston had instructed the crew to (but not how to) put the washing machine in the cargo box and he watched from the fourth floor as the task was completed. Other than Hosey recalling that the washing machine was "awkward," no H&P employee noted anything out of the ordinary about moving it. It is undisputed that no one from Shell instructed the H&P crew on how to move the washing machine. Nor was any Shell representative in the vicinity when the washing machine was lifted and moved.

A few hours later, Hosey says he felt pain in his lower back.[6]

Hosey now complains that he did not have access to using a dolly when moving the washing machine. Hosey admits that he did not discuss with his co-worker or anyone else the need for a dolly before moving the washing machine. Nor did his co-worker consider using a dolly to move the washing machine that night. In fact,

_____

[6] Hosey recalled that the washing machine was moved around 10:30 or 11:00 and the first time he felt pain in his lower back was around "1 or 2 o'clock" or "around 12, 1, somewhere around that area."

4

Hosey and Davis had performed similar manual lifts in the past, as had other H&P employees.[7]

A two-wheeled metal dolly was located in the warehouse just adjacent to the third floor landing area where Hosey and Davis had moved the washing machine to the cargo box. During the day, the warehouse is unlocked and managed by Kermit Menard, a material specialist employed by another Shell Offshore independent contractor, Danos LLC. Mr. Menard used the dolly "to unload cargo box materials and carry them inside the warehouse to put them on the check-in tables." Mr. Menard "would loan the dolly to anyone who comes in the warehouse and asks for it," including H&P employees. After 6 p.m., however, the warehouse is locked. But Mr. Menard remained "on-call" to provide access to the warehouse. After 6 p.m., Mr. Menard could be contacted in three ways: contact the control room; go to his room, 304 (right next to the entry hallway for the door to the warehouse); or use the public address system. "If [Mr. Menard is] up, [he] would answer the PA and open the warehouse for you." Neither Hosey nor Davis discussed or requested or considered getting a dolly to assist in lifting the washing machine on December 8, 2018. Alston testified that, if a member of the crew determined that a dolly was needed to perform

---

[7] Hosey stated that he had previously used a dolly to assist in moving washing machines on prior occasions; he also testified that he and Mr. Davis had "performed lifts like that in the past."

a task, he would have expected his crew to wait until a dolly was located; this included an expectation that someone would "call the warehouse guy or they get him up."  Whether a dolly was needed or could be useful was up to the crew members completing the task at hand.

On April 26, 2019, David Hosey sued Shell Offshore Inc. and Shell Oil Company, alleging that Shell's negligence caused his lower back injury.  He seeks to recover for general damages, lost wages, lost earning capacity, pain and suffering, as well as past and future medical expenses, and loss of society and services.  In a later amended complaint, David's wife, Jennifer, brought a claim against Shell, seeking damages for loss of consortium.  The defendants now seek summary judgment dismissing the plaintiffs' claims that the defendants' negligence caused their injuries.

I.

*A.*

Summary judgment is proper if the record discloses no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986). A fact is "material" if it "might affect the outcome of the suit." Id.

The Court emphasizes that the mere argued existence of a factual dispute does not defeat an otherwise properly supported motion. See id. Nor do "[u]nsubstantiated assertions, improbable inferences, and unsupported speculation[.]" Brown v. City of Houston, Tex., 337 F.3d 539, 541 (5th Cir. 2003); Hathaway v. Bazany, 507 F.3d 312, 319 (5th Cir. 2007)("[T]he nonmoving party cannot defeat summary judgment with conclusory allegations, unsubstantiated assertions, or only a scintilla of evidence."). Therefore, "[i]f the evidence is merely colorable, or is not significantly probative," summary judgment is appropriate. Anderson, 477 U.S. at 249-50 (citations omitted).

Summary judgment is also proper if the party opposing the motion fails to establish an essential element of his case. See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); see also In re La. Crawfish Producers, 852 F.3d 456, 462 (5th Cir. 2017)(citation omitted)(If the non-movant will bear the burden of proof at trial, "the movant may merely point to an absence of evidence, thus shifting to the non-movant the burden of demonstrating by competent summary judgment proof that there is an issue of material fact warranting trial."). In this regard, the non-moving party must do more than simply deny the allegations raised by the moving party. See Donaghey v. Ocean Drilling & Exploration Co., 974 F.2d 646, 649 (5th Cir. 1992). Rather, he must come forward with competent evidence, such as affidavits or

depositions, to buttress his claims. Id. Hearsay evidence and unsworn documents that cannot be presented in a form that would be admissible in evidence at trial do not qualify as competent opposing evidence. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547, 549 (5th Cir. 1987); FED. R. CIV. P. 56(c)(2). Ultimately, to avoid summary judgment, the non-movant "must go beyond the pleadings and come forward with specific facts indicating a genuine issue for trial." LeMaire v. La. Dep't of Transp. & Dev., 480 F.3d 383, 387 (5th Cir. 2007).

In deciding whether a fact issue exists, the Court must view the facts and draw reasonable inferences in the light most favorable to the nonmoving party. Scott v. Harris, 550 U.S. 372, 378 (2007); Midwest Feeders, Inc. v. Bank of Franklin, 886 F.3d 507, 513 (5th Cir. 2018). Although the Court must "resolve factual controversies in favor of the nonmoving party," it must do so "only where there is an actual controversy, that is, when both parties have submitted evidence of contradictory facts." Antoine v. First Student, Inc., 713 F.3d 824, 830 (5th Cir. 2013)(internal quotation marks and citation omitted).

*B.*

It is undisputed that federal jurisdiction is predicated on the Outer Continental Shelf Lands Act (OSCLA), 43 U.S.C. § 1331,

et seq.[8]   Absent from the papers is any discussion supporting the parties' assumption that Louisiana law governs this OCSLA case, notwithstanding the Supreme Court's recent pronouncements on the subject.  See Parker Drilling Mgmt. Servs., Ltd. v. Newton, 139 S. Ct. 1881 (2019).

The OCSLA "gives the Federal Government complete 'jurisdiction, control, and power of disposition' over the [outer Continental Shelf], while giving the States no 'interest or jurisdiction' over it." Parker Drilling, 139 S. Ct. at 1888-89 (quoting 43 U.S.C. §§ 1332(1), 1333(a)(3)). Under the OCSLA, federal law applies to the outer Continental Shelf "to the same extent as if the outer Continental Shelf were an area of exclusive Federal jurisdiction located within a State." 43 U.S.C. § 1333(a)(1). So, "the only law on the [outer Continental Shelf] is federal law, and state laws are adopted as federal law only 'to the extent that they are applicable and not inconsistent with' federal law."  Parker Drilling, 139 S. Ct. at 1889 (quoting 43

---

[8] The Outer Continental Shelf Lands Act established the Outer Continental Shelf as a federal enclave.  43 U.S.C. § 1333(a)(1). In so doing, Congress broadly conferred on the federal courts jurisdiction to hear claims arising out of or related to oil production on the Outer Continental Shelf.  Id. at § 1349(b); Barker v. Hercules Offshore, Inc., 713 F.3d 208, 213 (5th Cir. 2013)(The OCSLA "asserts exclusive federal question jurisdiction over the OCS by specifically extending '[t]he Constitution and laws of the civil and political jurisdiction of the United States...[to the OCS].").

U.S.C. § 1333(a)(2)(A))(internal brackets omitted).  State law is "applicable and not inconsistent with" federal law "only if federal law does not address the relevant issue." <u>Parker Drilling</u>, 139 S. Ct. at 1889.

Here, the parties assume that Louisiana law applies as surrogate federal law.  Mr. Hosey's alleged injuries occurred on a fixed platform in federal waters on the Outer Continental Shelf. Once OCSLA jurisdiction is established, as it is here, the Court generally turns to the statute's choice of law provision to determine the law applicable to particular claims.  For the purposes of resolving this motion, the Court assumes as the parties do that Louisiana law governs the question of Shell's negligence because federal law does not address the issue.  See <u>Parker Drilling</u>, 139 S. Ct. at 1889.[9]

## II.

First, the Court takes up Shell Oil Company's submission that summary judgment in its favor is warranted because it neither owned nor operated the Olympus TLP.  The Court agrees.  The plaintiff offers no evidence to controvert the defendants' evidence

---

[9] <u>Cf.</u> 28 U.S.C. § 5001(b)("In a civil action brought to recover on account of an injury sustained in a place [subject to the exclusive jurisdiction of the United States within a State,] the rights of the parties shall be governed by the law of the State in which the place is located.").

demonstrating that Shell Oil Company owed no duty to the plaintiffs because it neither owned nor operated the Olympus TLP.  Summary judgment in favor of Shell Oil Company is thus appropriate.

Second, Shell Offshore submits that it is entitled to judgment as a matter of law because, as a principal, it maintained no operational control over and thus owed no duty to H&P employee Mr. Hosey.  Even if he can show that Shell Offshore owed a duty as a matter of law or contract, no such duty was breached.  The plaintiffs counter that Shell Offshore was independently (not vicariously) negligent insofar as it owed a duty to provide unfettered access to dollies so that H&P could opt for the safest method of performing its work.  The parties' positions implicate overlapping negligence principles.  Mindful that the touchstone of all negligence claims is reasonableness -- not perfection -- the Court considers the scope of a principal like Shell's duty to independent contractors first and then the source and scope of any independent duty owed.[10]

---

[10] The plaintiffs insist that the independent contractor defense is inapplicable here.  The Court disagrees.  The defense and its attendant inquiry into operational control is essentially a specific jurisprudential gloss on the Louisiana Code's general negligence principle.  Even if the defense has no application where the plaintiff -- for whatever reason -- chooses not to sue his employer (that is, where the issue of vicarious liability technically is not placed at issue by the plaintiff), the defendants are entitled to judgment as a matter of law on the issue.  Ultimately, the plaintiffs fail to carry their burden on

*A.*

When an employee of an independent contractor injured while working on an offshore oil platform sues the principal/platform owner, the platform owner may invoke the independent contractor defense.  "It is well established that a principal is not liable for the activities of an independent contractor committed in the course of performing its duties under the contract."  Davis v. Dynamic Offshore Resources, 865 F.3d 235, 236 (5th Cir. 2017)(quoting Bartholomew v. CNG Producing Co., 832 F.2d 326, 329 (5th Cir. 1987)).  There are two exceptions to this general rule. A principal is not shielded from liability if (1) the activities which it contracts out to an independent contractor are ultrahazardous; or (2) the principal "exercises operational control over those acts or expressly or impliedly authorizes an unsafe practice."  Bartholomew, 832 F.2d at 329 (holding that there was some evidence to support the jury's finding that the principal was 30% at fault, given that the principal's company man expressly authorized an unsafe work practice, that is, failing to wash down the rig floor which eventually caused Bartholomew to slip and twist his back on the muddy rig floor).

---

each essential element of their negligence claim no matter their theory.

To establish liability of a principal where there is no ultrahazardous activity,[11] then, the inquiry is whether there is any evidence that the principal exercised operational control over its independent contractor or expressly or impliedly authorized the unsafe practice which caused the injured worker's injuries. There is no evidence that Shell exercised operational control over H&P or that it expressly or impliedly authorized the method H&P chose to move the washing machine.

Here, H&P elected the method or manner its crane crew would use to move the washing machine. The record indicates that H&P policy dictated that awkward items or items weighing more than 50 pounds called for a two-person manual lift or the assistance of equipment. Lead roustabout Hosey and his co-worker Davis proceeded with a two-person manual lift. There is no evidence that Shell played any role in the movement of the washing machine, or that it decided how the washing machine should be moved, or that it authorized an unsafe working condition. "If 'work is done in an unsafe manner, the [principal] will be liable if he has expressly or impliedly authorized the *particular manner* which will render

---

[11] Lifting a washing machine, which can be accomplished safely when proper precautions are used, does not qualify as an ultrahazardous activity. See Ainsworth v. Shell Offshore, Inc., 829 F.2d 548, 549 (5th Cir. 1987)(pile driving, storage of toxic gas, blasting with explosives, and crop dusting are examples of ultrahazardous activities).

the work unsafe, and not otherwise.'"  Davis, 865 F.3d at 236-237
(citation omitted, emphasis in original).

     Where there is an absence of evidence that a principal
exercised operational control or otherwise authorized an unsafe
working condition that led to a worker's injury, the case
literature is replete with examples of summary judgment being
granted in the principal's favor.  In Davis v. Dynamic Offshore
Resources, L.L.C., 865 F.3d 235 (5th Cir. 2017), for example, the
Fifth Circuit affirmed the grant of summary judgment by the
district court in favor of a principal.  There, Davis, a crane
mechanic employed by an independent contractor was allegedly
injured during a personnel basket transfer to the principal's
platform.  The summary judgment record demonstrated that the
principal ordered that the crane winch be replaced on a particular
platform, but Davis postponed replacing the winch due to safety
concerns related to wind.  Id. at 235-36.  Davis nevertheless
decided to inform the principal's foreman on another platform by
being transported to that other platform by personnel basket.  Id.
at 236.  During the transfer, Davis was injured.  Id. Because the
principal did not order Davis to make a personnel basket transfer
in high winds -- that was Davis's call -- the principal did not
authorize an unsafe working condition that caused Davis's injury,
making summary judgment appropriate.  Id. at 236-37.

And Shell invokes Offord v. L&W Supply Corp., 358 Fed.Appx. 540 (5th Cir. 2009), where the Fifth Circuit in an unpublished opinion affirmed the district court's grant of summary judgment in favor of a principal. Truck driver Offord was injured when he slipped and fell off the trailer bed of an 18-wheeler while removing a tarp covering a load of sheetrock. Id. at 542. The sheetrock was being delivered to a customer, Seacoast, whose employees were responsible for offloading the sheetrock once the tarp was removed from the truck. Id. Offord sued Seacoast for, among other things, failing to provide equipment that would have prevented his fall. Applying the general rule that a principal is not liable for the acts of an independent contractor, the district court granted Seacoast's motion for summary judgment, and the Fifth Circuit affirmed its finding that Offord "decided how to remove the tarp" and "no one forced or directed him to climb on the load or did anything that caused him to be on the load." Id. at 542-43. The Fifth Circuit also rejected the plaintiff's claim that Seacoast had a duty to provide fall protection equipment; no duty existed and summary judgment was appropriate because there was no evidence that Seacoast "controlled or actively supervised [the plaintiff's] work." Id. at 543.

Like Davis and Offord, Hosey along with his co-worker decided in the moment how H&P would perform the task of moving the washing machine. In opting for a two-worker manual lift, this task was

15

accomplished consistent with H&P policy.  No one at Shell directed Hosey or H&P regarding the method or manner to use in moving the washing machine 10 feet into the cargo box.

Rather than identifying facts indicating operational control by Shell, Hosey says the defense is not relevant because he opted not to sue H&P or otherwise pursue a theory of vicarious liability. Hosey thus does not appear to dispute that Shell lacked operational control over H&P in moving the washing machine.  Hosey's negligence theory focuses instead on Shell's policy that the warehouse was locked at night: "By prohibiting access to the dollies for Plaintiff and the rest of the H&P nighttime crew," the plaintiff argues, "Shell created a hazard and failed to ensure that the operation of lifting and moving the washing machine on the night of December 8, 2018 could be executed in the safest possible manner."

Broadly construing Hosey's negligence theory, he suggests that Shell's policy hindering access to dollies at night impliedly authorized or dictated a two-person manual lift (a method condoned by H&P, which Hosey perplexingly does not suggest is unreasonably hazardous) to the exclusion of using a dolly.  The summary judgment record does not support Hosey's theory of negligence.  Without citation to the summary judgment record, plaintiff's counsel argues that the crane crew had no access to the dollies at night and this is the reason why the plaintiff did not consider using

16

one.   This is an unsubstantiated assertion.   Stopping short of
saying he opted not to use a dolly on December 8, 2018 because he
did not think he could retrieve one, the record shows that H&P
workers faced with lifting heavy items routinely adhered to H&P's
policy of lifting with their legs and either using two workers or
the assistance of a dolly.   The plaintiff's generalized testimony
that he would not have considered waking up the warehouse manager
unless it was an emergency does not itself create a genuine dispute
concerning whether dollies were reasonably available for use or,
critically, whether he asked for one or considered using one on
the night he claims he was injured.   The plaintiff identifies no
material facts that would create a genuine dispute about Shell's
lack of operational control over the methods H&P used to complete
its assigned tasks.

    In this case, though, by abandoning any operational control
theory of liability, Hosey likewise seems to reject the theory
that the two-worker lift method was an unsafe practice which caused
his injury.   This is perplexing.   Hosey's argumentative gymnastics
do not defeat Shell's properly supported motion for summary
judgment.   Insofar as the plaintiffs rely completely on a theory
of independent principal liability, the considerations that
preclude a finding of operational control (and by extension
vicarious liability) also compel the conclusion that Shell did not
owe an independent duty to H&P employees based on the terms of the

contract; even if it did, the duty was not breached.  The Court now turns to consider this independent negligence theory.

*B.*

"[E]ven though the general rule shields a principal from the acts of its independent contractor that do not fall within the [two referenced] exceptions, the principal remains liable for its own acts of negligence."  Graham v. Amoco Oil Co., 21 F.3d 643, 645 (5th Cir. 1994)(citations omitted).  The same considerations that preclude a finding of operational control also compel the conclusion that Shell did not owe an independent duty to H&P's employees.  Hosey fails to demonstrate an issue of material fact as to whether Shell is liable under Article 2315 because on this record as a matter of law Shell owed no independent duty to Hosey; even assuming, for the sake of argument, that it owed an independent duty, the duty was not breached (nor does the record suggest that any breach caused Hosey's injury).

Civil Code Article 2315, Louisiana's source of negligence liability, instructs that "[e]very act whatever of man that causes damage to another obliges him by whose fault it happened to repair it." LA. CIV. CODE art. 2315(A).  "Every person is responsible for the damage he occasions not merely by his act, but by his negligence, his imprudence, or his want of skill." LA. CIV. CODE art. 2316.  Taking into account the conduct of each party and

18

the circumstances of each case, courts employ a duty-risk analysis to determine whether to impose liability based on these broad negligence principles. Lemann v. Essen Lane Daiquiris, Inc., 2005-1095, p. 7 (La. 3/10/06); 923 So. 2d 627, 632.

To recover under the duty-risk approach, the plaintiffs must prove five elements: (1) the defendants had a duty to conform their conduct to a specific standard; (2) the defendants' conduct failed to conform to the appropriate standard; (3) the defendants' substandard conduct was cause in fact of the plaintiffs' injuries; (4) the defendants' substandard conduct was a legal cause of the plaintiffs' injuries; and (5) actual damages. Audler v. CBC Innovis, Inc., 519 F.3d 239, 249 (5th Cir. 2008)(citation omitted). If the plaintiffs fail to prove one of these elements, then the defendant is not liable.

Whether a defendant owes a duty and the scope of any duty is a question of law that varies "depending on the facts, circumstances, and context of each case and is limited by the particular risk, harm, and plaintiff involved." Dupre v. Chevron U.S.A., Inc., 20 F.3d 154, 156-57 (5th Cir. 1994)(citations omitted). When an employee of an independent contractor alleges that the relationship between a platform owner and its employer creates an independent duty of care on the part of the platform owner, the Court first looks to the terms of the contract between

19

the owner and the independent contractor.  <u>See</u> <u>Graham</u>, 21 F.3d at
647 (citation omitted).

Here, the parties' contract obliged H&P to "furnish PERSONNEL
as expressly specified herein, physically fit, suitably trained,
licensed and certified, as applicable and supervision."  Shell was
designated as the "COMPANY" and H&P was designated as an
"Independent Contractor" in which "the actual performance of the
WORK shall be by CONTRACTOR" and "CONTRACTOR shall take reasonably
necessary measures to provide safe working conditions in
connection with the WORK."  In support of its independent
negligence theory, the plaintiff points to Shell's obligation to
provide to H&P certain items like "hand tools"; Hosey concludes
that this obliged Shell to provide dollies to platform workers.
Hosey does not identify any provision that allows Shell to control
the manner or method of H&P's work.  Hosey does not dispute that
H&P's own general policy permitted manual lifts by two people when
moving something that weighed more than 50 pounds.

Shell submits that it had no duty to offer unfettered access
to dollies on its platform.  Considering the facts, circumstances,
and context of this case including the particular risk, harm, and
plaintiff involved, the Court agrees.

The duty Hosey implores the Court to find as a matter of law
and impose upon Shell is the duty to provide unfettered access to

dollies.  Hosey contends that Shell created a hazard by failing to
ensure that lifting and moving the washing machine could be
performed in the "safest possible manner."  Hosey's position
ignores the context of this case in which Shell as principal owed
a duty to provide a reasonably safe platform and H&P as independent
contractor owed a duty to perform and supervise the reasonably
safe performance of the work.  The record shows that H&P considered
it reasonably safe for two workers to perform a lift of heavy items
like the washing machine.  Shell did not direct Hosey or H&P to
lift the washing machine in a particular way.  In this regard, the
alleged hazard identified by the plaintiff (the manual lift of
heavy equipment) was not a hazard created by Shell; if it was a
hazard, it was permitted and condoned by H&P.  The Court finds
that under the circumstances, including the particular risk and
the potential harm addressed by H&P's own policy and custom, Shell
owed no particular duty to provide the safest possible method for
lifting heavy items.  To be sure, in an analogous context, "[i]t
is well established that [c]ourts do not require a principal to
discover and correct unsafe loading procedures performed by
independent contractors."  Iglesias v. Chevron U.S.A. Inc., 656 F.
Supp. 2d 598, 602 (E.D. La. 2009).

    Even assuming that Shell owed a contractual or ex contractual
duty to provide equal dolly access to daytime and nighttime crews,

Shell submits that it did not breach the duty.  Again, the Court agrees.  To be sure, a platform owner must take *reasonable* steps to ensure a safe working environment.  <u>Dupre</u>, 20 F.3d at 157 (emphasis added).  The record indicates that Shell's policy of locking the warehouse from 6 p.m. to 6 a.m. did not render all dollies inaccessible; rather, it merely required that anyone opting to use a dolly must first contact the warehouse manager or find the other key in the control room.[12]  That there may have been an extra hurdle to retrieve (or a delay in retrieving) a dolly during the night shift does not render either dollies inaccessible or the platform unsafe.[13]

In opposing summary judgment, the plaintiff argues that Shell "preclud[ed] Plaintiff's ability to obtain a dolly to assist in completing the operation safely" and that the plaintiff "did not utilize a dolly on the night of the incident because Shell prevented them from having access to one."  But the plaintiff's

---

[12] Even during day shifts, the record indicates that anyone seeking out a dolly either found one around the platform or asked the warehouse manager for permission to use the dolly located there.
[13] H&P Deck supervisor Mark Alston, who observed Hosey and Davis performing the lift, testified that "[i]f the crew...decided that they needed a dolly to move the washing machine," he "expected them to wait until we got a dolly down there or we got some more people down there to look at the job."  With respect to how to get a dolly at night, Alston testified that he "hope[ed] they have one unlocked" and if he cannot find one unlocked, then "to wait" or, if something is needed from the warehouse at night, "[w]e call the warehouse guy or they get him up."

hindsight negligence theory fails to withstand summary judgment practice and procedure.  Again, even assuming that Shell owed a duty to provide unfettered access to dollies, the plaintiff fails to identify material facts in the record that create a genuine dispute on the issue of breach.  Although the plaintiff indicated that he would not have woken up the warehouse manager unless it was an emergency, nowhere in the record are there facts to support the plaintiff's argument that, on the night of December 8, 2018, he did not use a dolly because he was barred access to one.

It is the plaintiffs' burden to establish that Shell owed a duty under Louisiana law to provide its independent contractor with unrestricted access to equipment on a platform even if the equipment is not requested or considered by the employees in the performance of their work.  It is likewise plaintiffs' burden to establish that Shell breached any such duty.  They have failed to satisfy either burden.  The plaintiffs have failed to provide the Court with any legal authority or contested issue of material fact to suggest that a platform owner somehow exposes an independent contractor to an unsafe work environment when that contractor performs its work without even asking for or seeking equipment they know is on the platform.  There is no evidence offered to suggest that H&P was prohibited from accessing dollies on the platform.  The record shows that Shell provided reasonable (though perhaps imperfect) access to the third floor warehouse to anyone

23

who requested that access.[14]   No facts support the plaintiffs' theory that access was prohibited on December 8, 2018.

Parsing Hosey's theory that Shell was independently negligent in not providing unfettered access to dollies at night, there is no evidence substantiating his attorney's argument that Hosey did not seek to utilize a dolly *because* they were unavailable for use on the night shift.  Davis testified that on the night of December 8, 2018, he did not consider looking for a dolly to assist in lifting the washing machine.  Hosey similarly stated that he did not explicitly request a dolly or consider trying to find one to assist in moving the washing machine:

> Q. Before lifting the washing machine, had you discussed with Mr. Davis how you two anticipated moving the washing machine into the box?
>
> A. I did.
>
> Q. And what did you discuss?
>
> A. That we was going to just lean it back and he grabbed one side, I grabbed the other and put it into the box.

_____

[14] Viewing the facts in the light most favorable to Hosey, Shell's nighttime lock down policy made it moderately more difficult to retrieve a dolly, considering that workers -- night or day -- generally had to go ask the warehouse manager for permission to use his particular dolly.  But the undisputed evidence also indicates that it was possible to contact the warehouse manager at night or retrieve a key from the control room, and that it was "expected" by H&P if workers deemed using a dolly necessary. Hosey's submission that, in theory, he would not have contacted the warehouse manager at night unless it is an emergency is an abstract observation where summary judgment procedure mandates concrete facts to defeat a properly supported motion.

Q. Have you and Mr. Davis performed lifts like that in
the past?

A. We have.
...

Q. Did anyone from Shell give you any instructions on
how to move the washing machine from the deck into the
box?

A. No.

Q. Did you speak to anyone other than Mr. Davis in terms
of assistance or help in terms of moving the washing
machine from the deck into the box?

A. No.
...

Q. Does H&P, your employer, have any policies or
procedures in terms of lifting equipment like the
washing machine?

A. Just lift with your legs and not your back, two
people over fifty pounds.

Q. And I gather the last part of your response is that
H&P's rules are that if a piece of equipment is over
fifty pounds, there must be two people picking it up?

A. Right.
...

Q. Prior to lifting the washing machine, did you
communicate with anyone from H&P or otherwise, regarding
equipment needed to move the washing machine?

A. No.
...

Q. And those occasions in the past when you've used the
dolly, how do you have access to it?

A. Just knock on the door and ask the warehouse guy can
you use his dolly?
...

Q.  Have you ever needed the use of a dolly and there wasn't one available in the warehouse?

A.  No.

Q.  On the evening of December 8 of 2018, did you and Mr. Davis discuss the need for a dolly?

A.  No.

Q.  Did you discuss...with anyone else the need for a dolly before you and Mr. Davis picked up the washing machine?

A.  No.
...

Q.  Was Mr. Austin available to you by radio in the event that you and Mr. Davis concluded that you needed a dolly in order to move the washing machine?

A.  Yes.


Hosey's own testimony does not support his litigation theory. Hosey's negligence theory is anchored to a hindsight assertion that is nowhere to be found in the summary judgment record:  Hosey argues that Shell should have ensured that dollies would be as accessible during the night shift as they were during the day shift so that lifts could be completed in the safest possible manner. Absent from the record is any statement by Hosey or any H&P employee, or any other evidence, that before the washing machine was moved, H&P determined that the two-worker manual lift was unsafe, or that a dolly was needed, but that they had to proceed without one because they lacked access to one.

Hosey's testimony is consistent with other evidence in the summary judgment record: two workers sharing the 50+ pound load and lifting with their legs was what *H&P* required.  Even indulging Hosey's negligence theory that Shell nevertheless owed a duty to provide H&P unfettered access to equipment H&P may opt to use, there is no evidence of breach (or if indulging argument, hindering access to a dolly constitutes breach, there is no legal causation evidence).  That Hosey in theory would not want to disturb the warehouse manager after hours is not material to the issue of whether a dolly could be located and used on that night or whether he considered finding or waiting for one.  Alston testified that if a dolly was needed or it was deemed unsafe to lift something with only two people, then the task should wait, or the warehouse manager should be contacted.  Even if Shell had a duty to ensure that its independent contractor only performed its duties in the *safest* possible manner (instead of deferring to its contractor's discretion of proceeding in a *reasonably* safe manner), there is no indication in the record that the decision to manually lift the dolly was made by Shell or that H&P elected to proceed manually solely because Hosey and H&P believed that it could not retrieve a dolly.[15]

---

[15] There is no dispute in the record that it was H&P that determined whether a two-man manual lift would be performed or whether a dolly would be used.  Putting a finer point on it, the summary judgment

27

In conclusion, Hosey offers no evidence that restricted access to a dolly dictated his and Davis's decision to manually lift the washing machine. Whether framed as a failure to prove duty, breach, or causation, Hosey's theory of recovery is that Shell should have provided the same access to dollies during the night shift as it did during the day shift. A hindsight theory of negligence is not a substitute for evidence. Hosey's personal injury claim against Shell calls for speculation layered upon a contingency that did not come to pass because, as the record indicates, neither he nor his co-worker nor the deck supervisor tried to (or considered trying to) locate a dolly to perform the task; a task that according to H&P policy could be performed in a reasonably safe manner manually by two workers. Just like a principal is generally under no duty to "correct unsafe loading procedures performed by independent contractors," <u>Iglesias</u>, 656 F. Supp. 2d at 602, Shell had no duty to provide unfettered access to equipment that its independent contractor may or may not choose to use in completing its work. Nor did it breach any such duty as the record confirms. Summary judgment in Shell Offshore's favor is warranted. See <u>Oliver v. Scott</u>, 276 F.3d 736, 744 (5th Cir. 2002) ("Conclusional allegations and denials, speculation, improbable inferences, unsubstantiated assertions, and legalistic

---

record indicates that not one H&P employee considered attempting to retrieve a dolly to complete the washing machine lift at hand.

argumentation do not adequately substitute for specific facts showing a genuine issue for trial.").

Finally, because Mrs. Hosey's claims are derivative of her husband's,[16] summary judgment in Shell's favor is likewise warranted dismissing her claims.

***

Summary judgment in both defendants' favor is patently appropriate. The plaintiffs have failed to persuade the Court that Shell Oil Company owned or operated the platform or that Shell Offshore Inc. owed Hosey a duty (or, if it did owe one, that it breached one, or that the breach caused his back injury). Hosey's hindsight speculation that if it had been easier to obtain a dolly that night, he would not have been injured fails to bridge the evidentiary gap created in part by the undisputed fact that the method chosen by the H&P employees on December 8, 2018 aligns with general H&P policy and custom that a two-person manual lift is a reasonably safe method for lifting heavy or awkward items. Because there is no genuine controversy as to any material facts to be resolved at trial, the defendants are entitled to judgment as a matter of law.

---

[16] Ferrell v. Fireman's Fund Ins. Co., 96-3028 (La. 7/1/97), 696 So.2d 569, 576.

Accordingly, IT IS ORDERED: that the defendants' motion for summary judgment is GRANTED, and the plaintiffs' claims are dismissed with prejudice.

New Orleans, Louisiana, October 14, 2020

_____
MARTIN L. C. FELDMAN
UNITED STATES DISTRICT JUDGE